**In re Grand Jury Witness Sara BALDINGER.**

**Crim. Misc. No. 3016 (WF).**

United States District Court, C. D. California. March 14, 1973.

154

Stark H. King, Sp. Atty., U. S. Dept. of Justice, Washington, D. C., Wm. D. Keller, U. S. Atty., Los Angeles, Cal., for petitioner.

Michael J. Lightfoot, Deputy Public Defender, Barrett S. Litt, Los Angeles, Cal., H. Peter Young, Venice, Cal., for respondent.

## OPINION

FERGUSON, District Judge.

In Kastigar v. United States, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972), the Supreme Court held that the use immunity statute, 18 U.S.C. §§ 6001–6005, on its face does not violate the Fifth Amendment. This action presents the issue of whether, under the factual context of this case, the granting of an immunity order under the statute would violate the Fifth Amendment rights of a witness called to testify before a grand jury. The court finds that it does.

The relevant facts presented are as follows:

1. On January 5, 1971, a fire bombing was committed at Claremont Men's College.

2. The Federal Bureau of Investigation assumed jurisdiction and began an investigation.

3. On at least five occasions, Sara Baldinger made statements to special agents of the FBI concerning the fire.

4. Based upon that information provided to the special agents, a federal grand jury was convened to investigate the matter.

5. Miss Baldinger was served with a subpoena to appear before the grand jury.

6. When she appeared, she asserted her Fifth Amendment privilege against self-incrimination.

7. The government applied to the court to grant her transactional immunity under 18 U.S.C. § 2514.

8. The government then withdrew that application and petitioned for a grant of use immunity pursuant to 18 U.S.C. § 6002 (see Appendix).

Miss Baldinger has raised a number of issues relating to the subpoena, the composition of the grand jury, and electronic surveillance. The court does not reach those issues in light of its determination regarding the constitutionality of the use immunity order requested by the government.

The use immunity statute was enacted as part of the Organized Crime Control Act of 1970, Pub. L. No. 91–452, § 201, 84 Stat. 922, 926. 18 U.S.C. § 6002 provides:

"§ 6002. Immunity generally

"Whenever a witness refuses, on the basis of his privilege against self-incrimination, to testify or provide other information in a proceeding before or ancillary to—

"(1) a court or grand jury of the United States,

"(2) an agency of the United States, or

"(3) either House of Congress, a joint committee of the two Houses, or a committee or a subcommittee of either House,

and the person presiding over the proceeding communicates to the witness an order issued under this part, the witness may not refuse to comply with the order on the basis of his privilege against self-incrimination; but no testimony or other information compelled under the order (or any information directly or indirectly derived from such testimony or other information) may be used against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order."

The Act repealed or made a conforming amendment to over 50 federal immunity statutes, although retaining in effect for four years one of them, 18 U.S.C. § 2514. Those statutes provided transactional, as opposed to use, immunity in an attempt to conform to the Supreme Court's statement in Counselman v. Hitchcock, 142 U.S. 547, 585–586, 12 S. Ct. 195, 206, 35 L.Ed. 1110 (1892):

"[N]o statute which leaves the party or witness subject to prosecution after he answers the criminating question put to him, can have the effect of supplanting the privilege conferred by the Constitution . . . . In view of the constitutional provision, a statutory enactment, to be valid, must afford absolute immunity against future prosecution for the offence to which the question relates. . . ."

Illustrative of the statutes enacted pursuant to Counselman, and conformed when § 6002 was enacted, is the Compulsory Testimony Act of 1893, which provided that with respect to testimony before the Interstate Commerce Commission,

"[n]o person shall be excused from attending and testifying . . . on the ground or for the reason that the testimony . . . required of him, may tend to criminate him or subject him to a penalty or forfeiture. But no person shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter or thing, concerning which he may testify . . . . Provided, that no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying." Act of Feb. 11, 1893, ch. 83, 27 Stat. 443.

The language of § 6002 was designed to conform to the Supreme Court's holding in Murphy v. Waterfront Commission, 378 U.S. 52, 84 S.Ct. 1594, 12 L.

Ed.2d 678 (1964). In that case, the petitioners had been granted immunity from prosecution under state laws, but refused to testify on the ground that their testimony might incriminate them under federal laws, to which the grant of immunity did not extend. Relying upon the principle that "a grant of immunity is valid only if it is coextensive with the scope of the privilege against self-incrimination, Counselman v. Hitchcock [*supra*]. . . . .," 378 U.S. at 54, 84 S.Ct. at 1596, the Court held the constitutional rule to be that

> "a state witness may not be compelled to give testimony which may be incriminating under federal law unless the compelled testimony and its fruits cannot be used in any manner by federal officials in connection with a criminal prosecution against him. . . ." 378 U.S. at 79, 84 S.Ct. at 1609.

Section 6002 was "designed to reflect the use-restriction immunity concept of *Murphy* . . . rather than the transaction immunity concept of *Counselman* . . . ." H.R. Rep. No. 91–1549, 91st Cong., 2d Sess., in 1970 U.S. Code Cong. & Admin. News 4007, 4018; S. Rep. No. 91–617, 91st Cong., 1st Sess. 145 (1969). Among the congressional motivations in enacting the use immunity statute was to preclude a "gratuity to crime," Shapiro v. United States, 335 U.S. 1, 15, 68 S.Ct. 1375, 92 L.Ed. 1787 (1948), or an "immunity bath," United States v. Monia, 317 U.S. 424, 63 S.Ct. 409, 87 L.Ed. 376 (1943), by drafting a statute that would provide narrower immunity against prosecution than that afforded by existing statutes but would still satisfy constitutional requirements.

In *Kastigar* the Court held that on its face the use immunity provided by 18 U.S.C. § 6002 is coextensive with the scope of the Fifth Amendment privilege and is sufficient to compel testimony over a claim of the privilege:

> "While a grant of immunity must afford protection commensurate with that afforded by the privilege, it need

not be broader. Transactional immunity, which accords full immunity from prosecution for the offense to which the compelled testimony relates, affords the witness considerably broader protection than does the Fifth Amendment privilege. . . . [The] sole concern [of the privilege] is to afford protection against being 'forced to give testimony leading to the infliction of "penalties affixed to . . . criminal acts."' Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection. It prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness.

> \*        \*        \*        \*        \*        \*

> "We conclude that the immunity provided by 18 U.S.C. § 6002 leaves the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege. The immunity therefore is coextensive with the privilege and suffices to supplant it. . . ." 406 U.S. at 453, 462, 92 S.Ct. at 1661, 1666. (Footnote omitted.)

*Kastigar* does not foreclose the inquiry presented in this case: may the granting of an immunity order pursuant to the use immunity statute fail to provide immunity coextensive with the scope of the Fifth Amendment privilege in a particular instance? *Kastigar* was directed solely to the issue of the statute on its face and did not reach the issue presented here. This case is squarely within the admonition contained in Seagram & Sons v. Hostetter, 384 U.S. 35, 52, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966), and reaffirmed in California v. LaRue, 409 U.S. 109, 119 n. 5, 93 S.Ct. 390, 397 n. 5, 34 L.Ed.2d 342 (1972):

> "Although it is possible that specific future applications of [the statute] may engender concrete problems of constitutional dimension, it will be

time enough to consider any such problems when they arise. We deal here only with the statute on its face. And we hold that, so considered, the legislation is constitutionally valid."

The operative clause in § 6002 which is the cornerstone of the litigation here, paralleled by similar language in the proposed immunity order which the government has submitted to the court, is that which states that when immunity is conferred, no testimony or information may be used against the witness in any criminal case, *"except a prosecution for* perjury, *giving a false statement,* or otherwise failing to comply with the order."* (Emphasis added.) Miss Baldinger contends that if she is required to testify pursuant to the proposed order, her Fifth Amendment rights will be violated, because her testimony before the grand jury could be used to incriminate her in a prosecution for making false statements to the FBI agents under 18 U.S.C. § 1001. The government, by contrast, contends that the phrase "giving a false statement" was intended by Congress to mean only "false statements made during the course of one's testifying before a grand jury," and that it would not apply to Miss Baldinger's prior statements to FBI agents.

In determining whether the proposed immunity order in this case violates the witness's constitutional rights, several issues are presented. First, do the words "giving a false statement" in the exception to the immunity provision of § 6002 refer only to the giving of a false statement under oath or before a grand jury? Second, does the term apply to statements made to FBI agents? Third, does the term exclude from immunity only false statements made subsequent to the grant of immunity, so as to preclude prosecution for false statements made in the past? Fourth, is the court's function under § 6003 purely ministerial, or does the court have discretion to refuse to issue the immunity order? And fifth, may the court properly exercise its jurisdiction at this stage of the proceedings?

*Does the "False Statement" Exception to Section 6002 Apply Only to Statements Made Under Oath or Before a Grand Jury?*

■ The government would have the court interpret the words "giving a false statement" in § 6002 to apply only to statements made under oath to a grand jury. The court rejects this interpretation, for it would require the court to engage in legislation.

The statute is plain and explicit. Immunity is not conferred in "a prosecution for . . . giving a false statement. . . ." Did Congress intend other than what it specifically said, so that this court may add words that Congress omitted?

No previous immunity statute has been called to the court's attention containing an exception for "giving a false statement." Previous statutes restricted the exclusion from immunity to prosecutions for perjury or for contempt. Congress, therefore, created a new exception from immunity in the use immunity statute—a witness's testimony may be used against him in a prosecution for "giving a false statement."

In support of its contention that the term "false statement" should be restricted to statements made under oath before a grand jury, the government cites two items of legislative history. The first is the Department of Justice's comments on the Organized Crime Control Act of 1969, in which the Department stated:

"Title II provides that when a witness refuses on the basis of the privilege against self-incrimination to testify or to provide information in a proceeding before a Federal court or grand jury, a government agency, or either House of the Congress or a Congressional committee, testimony may be ordered, but the testimony which is compelled or information obtained from the testimony which is compelled may not be used against the witness in any criminal case. An exception of course is made for criminal

offenses committed during the testimony, such as perjury and false statement, and for failure to comply with the order itself. The statutory immunity is intended to be as broad as, but no broader than, the privilege against self-incrimination." Hearings on S. 30 Before Subcomm. No. 5 of the House Comm. on the Judiciary, 91st Cong., 2d Sess., ser. 27, at 162 (1970).

The other is the House report on the Organized Crime Control Act of 1970, which states:

"The exception for perjury, false statements or other failure to comply with the order is probably unnecessary. See United States v. Monia [*supra*]. It is included out of caution to insure that such immunity is not given. See United States v. Orta, 253 F.2d 312 (5th Cir.) [cert. denied, 357 U.S. 905, 78 S.Ct. 1149, 2 L.Ed.2d 1156 (1958)]." House Report, *supra*, in 1970 U.S.Code Cong. & Admin. News 4018.

The interpretation of the Justice Department is an expression of opinion of statutory construction. The Department cannot guarantee, nor has it offered, to exempt Miss Baldinger from a prosecution for making a false statement under 18 U.S.C. § 1001 or any other statute that may apply to her. It must enforce the law. Such an exemption from prosecution can be granted only by Congress. The government, of course, knows that Miss Baldinger made statements to the FBI. It applied for transactional immunity, but then withdrew that application which if granted would have prevented it from prosecuting her under § 1001. Knowing that, it then applied for use immunity, which would subject her to such a prosecution.

The statement in the House report adds nothing to the interpretation requested by the government. In fact, the report specifically states that the exception for false statements was added to "insure that such immunity is not given." The two cases cited, *Monia* and *Orta*, contain nothing with reference to false statements. *Orta* is concerned with perjury only, while the issue in *Monia* was whether a grand jury witness obtained immunity from prosecution under the broad transactional immunity provision of the Sherman Act, despite the fact that he had not claimed the privilege against self-incrimination.

Three sections of Title 18 are relevant to the instant inquiry—§ 1001, "Statements or entries generally"; § 1621, "Perjury generally"; and § 1623, "False declarations before grand jury or court."

Section 1621, the perjury statute, provides:

"Whoever, having taken an oath before a competent tribunal, officer, or person . . . willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall . . . be fined not more than $2,000 or imprisoned not more than five years, or both. . . ."

Section 1001, the false statement statute, states:

"Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully . . . makes any false . . . statements . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both."

And § 1623, the false declarations statute, provides:

"(a) Whoever under oath in any proceeding before . . . any court or grand jury of the United States knowingly makes any false material declaration . . . shall be fined not more than $10,000 or imprisoned not more than five years, or both.

\* \* \* \* \* \*

"(c) . . . In any prosecution under this section, the falsity of a declaration . . . shall be established sufficient for conviction by proof that the defendant while under oath made irreconcilably contradictory declarations . . . . ."

Clearly, the term "false statement" used in § 6002 is not coterminous with the class of statements prosecutable under the perjury statute, § 1621. If Congress had intended it to be, then the use of the term "giving a false statement" would have been entirely redundant with the term "perjury" in § 6002, and there would have been no reason for Congress to have inserted the false statement exception in the statute.

The government's position might be supportable if the phrase "false statement" in § 6002 was intended to have the same meaning as "false declaration" in § 1623, since the latter must be made under oath to be prosecutable. The wording and legislative history of §§ 1623 and 6002, however, belie such a contention.

Sections 1623 and 6002 were both enacted as parts of the Organized Crime Control Act of 1970.[1] The congressional purpose in enacting § 1623 was to create a new statutory offense free from the limiting common law evidentiary requirements applicable to perjury prosecutions (principally the "two-witness rule" requiring corroboration of perjury by the testimony of two witnesses or that of one witness plus independent evidence). Section 1623(c) accomplished this goal by allowing the offense to be proven by two irreconcilably false declarations under oath. The false declarations statute is not coextensive in scope with § 1621, since it applies only to declarations made under oath before a court or a grand jury, while the perjury statute applies "before a competent tribunal, officer, or person . . . ." *See* House Hearings, *supra,* at 100, 163, 495. Thus, in essence, § 1623 provides for an easier method of proof and for greater penalties in a limited class of perjury cases.

Section 1623 refers to a false *declaration,* while the use immunity exception in § 6002 and § 1001 both refer to a false *statement.* If Congress had in-

tended "false statement" in § 6002 to mean the same thing as "false declaration" in § 1623, it manifestly would not have used different words to describe the same term in the same statute. It is apparent that "false statement" was intended to have a broader meaning than "false declaration."

Section 1623 requires a "declaration" to be made under oath in order to be prosecutable under that section. However, § 6002 does not refer to a false statement being under oath. The language of § 6002 falls squarely within the conduct prohibited in § 1001, where a prosecution may lie even though the statement was not made under oath. Moreover, the use of the same term in § 6002 as in § 1001, at the same time that Congress used a different term, "false declaration," in § 1623 to define only statements made under oath, indicates that Congress intended the term "false statement" in § 6002 to be coterminous with the term in § 1001.

For these reasons, the court finds that Congress did not intend the term "false statement" as used in § 6002 to be restricted to statements made under oath, as in §§ 1621 and 1623. Rather, the court concludes that the term "false statement" was intended to have the same meaning as the phrase "false statement" in § 1001.

It is well established that the term "false statement" in § 1001 encompasses statements not made under oath as well as those made under oath. In addition, the term is not restricted to statements required to be made by law or in writing. United States v. Adler, 380 F.2d 917, 922 (2d Cir.), cert. denied, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967); Neely v. United States, 300 F.2d 67, 71–72 (9th Cir.), cert. denied, 369 U.S. 864, 82 S.Ct. 1030, 8 L.Ed.2d 84 (1962); United States v. Stephens, 315 F.Supp. 1008, 1010 n.2 (W.D. Okla. 1970).

1. 18 U.S.C. § 6062 was enacted as Title II, § 201 of the Act, while 13 U.S.C. § 1623 was enacted as Title IV, § 401.

As a further indication that the term "false statement" in § 6002 does not mean "false statement to a grand jury," in United States v. Allen, 193 F.Supp. 954, 957–959 (S.D. Cal. 1961), it was held that a prosecution under § 1001 could not lie for false statements made before a grand jury, and that only a perjury prosecution was proper. The court determined that "the defendant's answers to questions propounded to him [were not] 'statements' within the meaning of § 1001," 193 F.Supp. at 957, and concluded that:

"The defendant has been improperly indicted under 18 U.S.C.A. § 1001, because the federal Grand Jury is not an 'agency of the United States' within the meaning of § 1001, and because this statute was not intended to cover the situation in which defendant is accused of having made a false and fraudulent reply when interrogated by the Grand Jury. In short, defendant should have been charged with perjury and indicted under 18 U.S.C.A. § 1621." 193 F.Supp. at 959. (Footnote omitted.)

It would have been highly incongruous for Congress to have intended "false statement" in § 6002 to mean "false statement before a grand jury" when no such offense exists.

*Does the Term "False Statement" Apply to Statements Made to FBI Agents?*

In United States v. Bedore, 455 F.2d 1109, 1110–1111 (9th Cir. 1972), the Ninth Circuit sketched the history of § 1001:

"Section 1001 originated more than 100 years ago in a statute drawn to penalize persons who made fraudulent claims for money against the Government. The statute was amended in 1934 'to embrace false and fraudulent statements or representations where these were knowingly and willfully used in documents or affidavits "in any matter within the jurisdiction of any department or agency of the United States." In this, there was no restriction to cases involving pecuniary or property loss to the government. . . .' (United States v. Gilliland [312 U.S. 86, 93, 61 S.Ct. 518, 85 L. Ed. 598 (1941)].) . . ."

*Gilliland* was the first case in which the Supreme Court interpreted § 1001 in substantially its present form. The Court determined the congressional purpose to be

"to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described. We see no reason why this apparent intention should be frustrated by construction." 312 U.S. at 93, 61 S.Ct. at 522.

After the statute was enacted into its present form in 1948, the Court in United States v. Bramblett, 348 U.S. 503, 507, 75 S.Ct. 504, 507, 99 L.Ed. 594 (1955), found "no indication in either the committee reports or in the congressional debates that the scope of the statute was to be in any way restricted. . . ." (Footnotes omitted.)

The Ninth Circuit has characterized the purpose behind the enactment of § 1001 as " 'to prevent . . . the willful submission to federal agencies of false statements calculated to induce agency reliance or action . . . .' " Brandow v. United States, 268 F.2d 559, 565 (9th Cir. 1959). The court in United States v. Stark, 131 F.Supp. 190, 205 (D. Md. 1955), aptly described the purpose of the false statement statute as

"to protect the government from the affirmative or aggressive and voluntary actions of persons who take the initiative, or, in other words, to protect the government from being the victim of some positive statement, whether written or oral, which has the tendency and effect of perverting its normal proper activities. . . ."

And this circuit has held that

"in keeping with the statute's 'vital public purpose of protecting governmental functions from frustration and distortion through deceptive practices

\* \* \* it must not be construed as if its object were narrow and technical.' . . ." Gilbert v. United States, 359 F.2d 285, 287 (9th Cir.), cert. denied, 385 U.S. 882, 87 S.Ct. 169, 17 L.Ed.2d 109 (1966).

In light of the purpose behind the enactment of § 1001, a number of courts have held that statements made to an FBI agent not under oath, other than mere responses to questioning initiated by the agent, are specifically within the scope of statements prosecutable as false statements. In United States v. Adler, *supra*, the court held that the defendant's false statement to an FBI agent that he had been required to pay bribes to government officials, which led to an FBI investigation, was a "matter within the jurisdiction of any department or agency of the United States" within the meaning of § 1001. The court reasoned that

"[c]onsistent . . . with the view that § 1001 was broadly drawn to protect the 'authorized functions' of federal agencies from 'perversion,' the word 'jurisdiction' as used in the statute must mean simply the power to act upon information when it is received. The making of intentionally false statements to the F.B.I. calculated to provoke an investigation by that agency may cause more 'perversion' of authorized agency functions—and more harm to individuals—than false pecuniary and property claims which are clearly covered by the statute. There is nothing to suggest, either in legislative history or in the cases, that Congress in enacting § 1001 intended to conserve the energies of only certain agencies. Accordingly, a technical construction of the word 'jurisdiction' which would exclude from the scope of § 1001 all matters strictly criminal in nature, is rejected . . . ." 380 F.2d at 922.

In United States v. Bedore, *supra*, an FBI agent went to the defendant's home to serve him with a subpoena to appear at a trial. When the agent asked him his name, the defendant gave a false response. The Ninth Circuit held that giving a false name to the agent "was not within the class of false statements that section 1001 was designed to proscribe." 455 F.2d at 1110. From the court's reasoning, however, it is clear that the statements made by Miss Baldinger to the FBI agents would be prosecutable as false statements:

"From the statutory history, it is evident that section 1001 was not intended to reach all false statements made to governmental agencies and departments, but only those false statements that might support fraudulent claims against the Government, or that might pervert or corrupt the authorized functions of those agencies to whom the statements were made. Typical of the kind of statements that are within the purview of section 1001 are *false reports of crime made to federal law enforcement agencies that may engender groundless federal investigations.* (United States v. Adler [*supra*] (false report of bribery made to FBI agent) . . . .)" 455 F.2d at 1111. (Footnote omitted; emphasis added.)

Miss Baldinger has made at least five oral statements to FBI agents. She has demonstrated to the court that she cannot remember what the statements contain. As a result of her statements, a grand jury was convened and the FBI instituted an investigation. Under *Bedore* and *Adler*, it is clear that her statements to the FBI agents relating to the Claremont College fire bombing if willfully false constitute "false reports of crime made to federal law enforcement agencies that may engender groundless federal investigations." In the event that Miss Baldinger has made any false statement to the FBI concerning the fire bombing, she is subject to prosecution under § 1001. Moreover, under the exception to immunity contained in § 6002 and the immunity order which the government has asked this court to grant, any testimony Miss Baldinger may give to the grand jury could then be used against her in a § 1001 prosecution.

*Does the "False Statement" Exception to Section 6002 Apply to Statements Made Prior to the Grant of Immunity?*

■ The government contends that the phrase "giving a false statement" was intended to mean only "false statements made *during the course* of one's testifying before a grand jury." If this interpretation is correct, then under the use immunity statute the compelled testimony and the fruits thereof could not be used against the witness in a prosecution for perjury or for making a false statement at any time prior to the grant of immunity.

■ The Fifth Amendment states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." It protects a person from being forced to incriminate himself with respect to crimes committed in the past; it does not, however, reach forward to protect against incrimination for future acts. In Glickstein v. United States, 222 U.S. 139, 142, 32 S.Ct. 71, 73, 56 L.Ed. 128 (1911), the Supreme Court held that "the immunity afforded by the constitutional guarantee relates to the past, and does not endow the person who testifies with a license to commit perjury. . . ." In Robinson v. United States, 401 F.2d 248, 251 (9th Cir. 1968), this circuit held that

"the privilege against self incrimination relates to past criminal acts and not to future acts such as perjury which the witness commits in the testimony which he proceeds to give. . . ."

In United States v. Orta, *supra,* the court noted:

"It is clear that the protection of the Fifth Amendment relates to crimes alleged to have been committed before the time when the testimony is sought. . . . Under no circumstances, however, could [a witness] commit perjury and successfully claim that the Constitution afforded him protection from prosecution for that crime. . . ." 253 F.2d at 314.

The court in United States v. Ponti, 257 F.Supp. 925, 926 (E.D. Pa. 1966), observed that

"[t]here is no doubt that as a witness before the Grand Jury, defendant was enveloped with the protections of the Fifth Amendment. Counselman v. Hitchcock [*supra*]. But the scope of that Amendment extends only to past acts, not to those that are or may be committed in the future. United States v. Kahriger, 345 U.S. 22, 32, 73 S.Ct. 510, 97 L.Ed. 754 [1953]. . . ."

The issue of whether forcing a witness to incriminate herself for past criminal acts violates the Fifth Amendment was squarely presented in United States v. Hoffman, 260 F.Supp. 566, 567 (M.D. Pa. 1966). In that case, the court refused to compel a witness to testify at a naturalization hearing pursuant to a subpoena if her testimony might expose her to prosecution for having made prior false statements, despite the government's contention that "[r]espondent is claiming the privilege because she is afraid she *will* commit perjury." (Emphasis in original.) The respondent argued that

"since she has been orally interviewed on several occasions by Agents of the Immigration and Naturalization Service that to require her to testify under oath and to tell the truth would expose her to prosecution and furnish the proof that she *has given* false statements in violation of 18 U.S.C. § 1001." 260 F.Supp. at 567. (Emphasis in original.)

The court, noting that the government had refused requests for a grant of immunity and for furnishing the witness with a copy of her statements, held that she was entitled under the Fifth Amendment to refuse to testify:

"While it is recognized that the Fifth Amendment is 'wholly inapplicable to future acts,' that is not what the Respondent is arguing. She is arguing that it might tend to incriminate her for perjury of past statements, not future testimony. . . ."

260 F.Supp. at 568. (Footnote omitted.)

It is thus clear that for a grant of immunity under the use immunity statute to provide protection coextensive with the Fifth Amendment privilege against self-incrimination, it must protect the witness from prosecution for acts of perjury or false statement committed prior to the grant of immunity. The proposed immunity order in this case provides no such protection to Miss Baldinger.

The proposed order, reflecting the words of the statute, states that Miss Baldinger "shall not be exempted by this order from prosecution for perjury, giving a false statement, or otherwise failing to comply with this order."

A reading of the statute, coupled with a search of the legislative history, reveals only two factors that might support the government's contention that only false statements made during the compelled testimony would be subject to prosecution under the proposed order. The first is the Department of Justice's comments on the Organized Crime Control Act of 1969, *supra*, which state, "An exception of course is made for criminal offenses committed *during the testimony*, such as perjury and false statement, and for failure to comply with the order itself." House Hearings, *supra*, at 162. (Emphasis added.) These comments cannot be accepted as authoritative, as the Department cannot guarantee to exempt Miss Baldinger from prosecution under any statute that she may in fact have violated except through congressional mandate.

The second possible factor concerns an interpretation of the word "otherwise" in the exclusion phrase "a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order." This factor was not raised by the government, and therefore the court need not consider it. Upon examination, however, the word provides no meaning to the phrase "giving a false statement." [2]

There are at least three factors which require the court to conclude that under the proposed immunity order, Miss Baldinger's compelled testimony could be used against her to prove prior false statements, in violation of the Fifth Amendment.

First, every previous immunity statute known to the court contains specific language restricting the exclusion from immunity to perjury committed during the compelled testimony. For example, both the Compulsory Testimony Act of 1893, *supra*, and the former antitrust immunity statute, Act of Feb. 25, 1903, ch. 755, § 1, 32 Stat. 904, contained nearly identical language: *"Provided, That no person so testifying shall be exempt from prosecution and punishment for perjury committed in so testifying."* The Communications Act of 1934, Act of June 19, 1934, ch. 652, § 409, 48 Stat. 1097, specified that "any individual so testifying shall not be exempt from prosecution and punishment for perjury *committed in so testifying.*" And the Immunity Act of 1954, Act of Aug. 20, 1954, ch. 769, § 1, 68 Stat. 745, provided that no witness was exempt from "prosecution for perjury or contempt *committed while giving testimony or producing evidence under compulsion as provided in this section.*" (Emphasis added.)

---

2. Grammatically, the word "otherwise" modifies the verb phrase "failing to comply" and not the gerund "giving." In the context of the statute, the word is used as an adverb. It is positioned closest to the phrase "failing to comply." That phrase signifies a negative omission, while "giving a false statement" denotes a positive act. For these reasons, the word "otherwise" provides little guidance in seeking a definition of the term "giving a false statement," particularly when that phrase and "failing to comply" are separated by the disjunctive "or." The statute was carefully drafted, and any other interpretation would unduly twist the statutory language. Even assuming, *arguendo*, that the word may be interpreted to support the goverment's position, strong countervailing considerations require the court to reject the construction advanced by the government.

In support of its holding in Glickstein v. United States, *supra*, that the immunity afforded by the Fifth Amendment relates to the past, the Supreme Court noted:

"That this is not disputable is shown by the fact that it has been accepted as self-evident in providing for immunity for one compelled to testify, as shown by the reservation in Rev. Stat., § 860, declaring that the immunity shall not extend to 'exempt any party or witness from prosecution and punishment for perjury committed in discovering or testifying as aforesaid,' and by a like provision, contained in the [Compulsory Testimony Act of 1893]. The first of these provisions was considered in Counselman v. Hitchcock, *supra*, and the second in Brown v. Walker [161 U.S. 591, 16 S. Ct. 644, 40 L.Ed. 819 (1896)], where it was expressly decided that the statute containing it complied with the constitutional guarantee." 222 U.S. at 142, 32 S.Ct. at 73.

In Robinson v. United States, *supra*, the Ninth Circuit upheld the perjury conviction of a witness who gave false testimony before a grand jury without having claimed the privilege against self-incrimination. The court observed that

"[i]t may be worth noting that statutes which grant or permit the court to grant immunity in exchange for testimony which may incriminate a witness, provide that the immunity does not cover perjury committed in the giving of the testimony for the giving of which immunity was granted." 401 F.2d at 251–252.

The absence of language in the use immunity statute specifically restricting perjury and false statements to those committed during the compelled testimony contrasts sharply with its inclusion in every other immunity statute called to the court's attention. If Congress had intended to restrict the exception from immunity to prosecutions for perjury or false statements committed be-fore the grand jury, it could easily have done so, as it had consistently in previous immunity statutes. Confronted with specific language in every previous immunity statute known to the court restricting the exception from immunity to perjury committed in the course of compelled testimony, and the contrasting absence of any such specific language in § 6002, the court is bound to interpret the use immunity statute according to the plain meaning of its terms. The court holds that the exception from immunity in § 6002 is not limited to perjury or false statements made in the course of the compelled testimony, but encompasses as well perjury or false statements made prior in time. Therefore, the scope of the immunity that would be conferred upon Miss Baldinger if the court grants the proposed immunity order would not be coextensive with the Fifth Amendment.

An additional consideration supporting this interpretation is that with reference to witnesses subpoenaed to testify before a grand jury, the false statement exception in § 6002 can refer *only* to *prior* false statements. In enacting the use immunity statute, Congress added a specific exception for "giving a false statement," an exception not contained in previous immunity statutes. Under the holding of United States v. Allen, *supra*, a prosecution for making a false statement does not lie for statements made before a grand jury. Therefore if, pursuant to the exception in § 6002, the grand jury testimony of a witness is to be used in a prosecution for giving a false statement, it can *only* be used in a prosecution for giving a *prior* false statement. Therefore the proposed immunity order, which provides that Miss Baldinger is liable for "prosecution for . . . giving a false statement," would specifically permit her testimony before the grand jury to be used to prosecute her for any false statement she may have made to the FBI agents.

An important additional factor militates in favor of the construction urged by Miss Baldinger, and against that sug-

gested by the government. In Kronick v. United States, 343 F.2d 436 (9th Cir. 1965), the appellant, a former corporate officer, first testified at a criminal trial in which the corporation was a defendant. He was then asked to testify under immunity at a civil trial in which the corporation was a defendant. He refused to answer certain questions because he feared a perjury prosecution arising from possible discrepancies between his testimony at the two trials. He was granted immunity under the broad transactional immunity provision of the antitrust laws, *supra*:

"[15 U.S.C.] § 32. Immunity of witness

"No person shall be prosecuted or be subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he may testify . . . *Provided*, That no person so testifying shall be exempt from prosecution or punishment for perjury committed in so testifying."

The *Kronick* court recognized the possibility of the witness's incriminating himself of perjury at the first trial through his testimony at the second. The court held, however, that the very broad immunity conferred by the statute served to immunize him from prosecution for perjury committed in the past:

"[I]f section 32 is to provide [the witness] with a complete substitute for [the Fifth Amendment] privilege in the event he is compelled to testify in this civil action which has a substantial relationship to the prior criminal case, it must immunize him from prosecution for perjury committed at the criminal trial.

"While Kronick does not contend that the perjury proviso of section 32 precludes immunity from charges of past perjury, the law is in any event settled that it does not. That proviso relates only to present perjury while the witness is on the stand and does not remove past instances of perjury from the immunity protection. . . ." 343 F.2d at 441.

The court further held that, under the broad immunity statute, the government could not rely on discrepancies between the witness's testimony at the two trials to prove perjury at the second trial, although a prosecution for perjury at the second trial was not precluded:

"We will assume for present purposes that . . . Kronick has, apart from any subjective state of mind, reasonable cause to fear that if he testifies in the civil action differently than he did in the criminal action, he may be prosecuted for perjury in connection with his new testimony.

"In the event of such a prosecution, his immunity under section 32 will, as the Government concedes, preclude the Government from relying upon any contradiction which may appear as between his new testimony and his past testimony. This is true because, since the immunity must be co-extensive with his constitutional privilege against self-incrimination, Kronick may not, unless immunized therefrom, be compelled to give testimony now which, by setting up a conflict with his previous testimony, enables the Government to prove present perjury." 343 F.2d at 441.

It is important to note that the Ninth Circuit's holding in *Kronick*—that the witness was not subject to prosecution for past acts of perjury, and that discrepancies between his past and present testimony could not be used to prove perjury at the second trial—was founded upon the extremely broad immunity provided for in the statute pursuant to which he was granted immunity. Indeed, the immunity granted was so broad in scope that the government *conceded* that it could not rely upon differences in the witness's testimony at the two trials to prosecute him for perjury at the second trial. In *Kronick*, the grant of immunity against prosecution for "any transaction, matter, or thing concerning which he may testify" was

held to encompass immunity against prosecution for prior acts of perjury. In the instant case, by contrast, the proposed immunity order is significantly narrower in scope. Moreover, the immunity statute in *Kronick* specifically excluded from the grant of immunity "prosecution or punishment for perjury committed *in so testifying*." (Emphasis added.) The exception from immunity for perjury and false statements in § 6002 is not so restricted. The failure of the use immunity statute to provide for immunity for past acts of perjury and false statement constitutes a defect that is laden with constitutional significance.

The Ninth Circuit reaffirmed its holding in *Kronick* in United States v. Gebhard, 426 F.2d 965 (9th Cir. 1970). The witness had been granted immunity under a broad transactional immunity statute which provided that:

> "[47 U.S.C. § 409] (1) No person . . . shall be prosecuted or subjected to any penalty or forfeiture for or on account of any transaction, matter, or thing concerning which he is compelled, after having claimed his privilege against self-incrimination, to testify . . . except that any individual so testifying shall not be exempt from prosecution and punishment for perjury committed in so testifying." Act of June 19, 1934, ch. 652, § 409, 48 Stat. 1097.

The witness first testified under a grant of immunity before a grand jury. This grant of immunity did not, under the terms of the statute, exempt him from prosecution for perjury committed in the course of the grand jury testimony. The witness was then called to testify at a criminal trial under a second grant of immunity. He refused, claiming that his compelled testimony at the trial could be used to prove that he committed perjury in his prior testimony before the grand jury. The court held that *Kronick* controlled:

> "Appellant argues that the § 409 immunity is not coextensive with his Fifth Amendment rights since the Gov-

ernment could use his testimony in the [criminal trial] against him on a possible retrial of his conviction for perjury before the grand jury. . . . This circuit, in Kronick v. United States, *supra,* resolved this issue against the appellant. The court there construed the immunity provisions of 15 U.S.C. § 32 (Anti-trust laws), which are parallel to those of § 409 in both language and purpose, to mean that testimony given under immunity at a subsequent proceeding cannot be used in any prosecution for perjury based on testimony given under immunity at a prior proceeding. Thus, the government was barred from perfecting its perjury prosecution against Gebhard by the use of any testimony he might have given in the [criminal] trial." 426 F.2d at 968.

In holding that the second grant of immunity precluded the government from using the witness's testimony at trial to prove perjury before the grand jury, the court relied on the fact that the immunity statute was "parallel . . . in both language and purpose" to that in *Kronick.* By contrast, the language and purpose of § 6002 are markedly different from the statutes in *Kronick* and *Gebhard.*

In the final analysis, the government's argument that the court must interpret "giving a false statement" in § 6002 to mean only "false statements made during the course of one's testifying before a grand jury" would require the court to engage in legislation. That may be a desirable end in achieving the government's desire to compel Miss Baldinger to testify, but it adds nothing to the great wall of separation between the legislative and judicial branches of our government. Congress has spoken in plain words, with which the government does not agree. To add the words desired by the government would amount to judicial legislation.

The problem of statutory construction is always a troublesome one. As Justice Frankfurter stated in Addison v. Holly

Hill Co., 322 U.S. 607, 617, 64 S.Ct. 1215, 1221, 88 L.Ed. 1488 (1944):

"If legislative policy is couched in vague language, easily susceptible of one meaning as well as another in the common speech of men, we should not stifle a policy by a pedantic or grudging process of construction. To let general words draw nourishment from their purpose is one thing. To draw on some unexpressed spirit outside the bounds of the normal meaning of words is quite another. For we are here not dealing with the broad terms of the Constitution 'as a continuing instrument of government' but with part of a legislative code 'subject to continuous revision with the changing course of events.' United States v. Classic, 313 U.S. 299, 316, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368 [1941]."

■ It is universal that when a statute uses plain understandable words, the court cannot legislate but must interpret the words as they read without any modification. "It is our judicial function to apply statutes on the basis of what Congress has written, not what Congress might have written." United States v. Great Northern Railway Co., 343 U.S. 562, 575, 72 S.Ct. 985, 993, 96 L.Ed. 1142 (1952).

■ The proposed immunity order in this case would violate the Fifth Amendment rights of the witness. Section 1001 provides for a prosecution for oral statements which are false. In order to obtain a conviction, Miss Baldinger's statements before a grand jury could be used in evidence against her. Her compelled testimony given under oath and truthful could be used in a prosecution for making statements contrary to her grand jury testimony.

In *Kastigar* the Supreme Court stated, "Immunity from the use of compelled testimony, as well as evidence derived directly and indirectly therefrom, affords this protection [against being forced to give testimony leading to the infliction of penalties affixed to criminal acts]. It prohibits the prosecu-

torial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." 406 U.S. at 453, 92 S.Ct. at 1661.

*Kastigar* held that the Fifth Amendment privilege against self-incrimination is violated if the government uses the compelled testimony to prosecute the witness for a past criminal offense. Under the exception to use immunity contained in the proposed order in this case, if the court grants the order compelling Miss Baldinger to testify, the government may use her testimony before the grand jury to prosecute her for having made false statements to the FBI agents. This is because, under the exception, the grant of use immunity does not apply to a prosecution for ". . . . giving a false statement . . . ."

In the context of this case, the immunity order that the government would have the court grant would do exactly what the Supreme Court held that it must not do. It would allow the government to use the compelled testimony to prove that the witness may be guilty of having made false statements at a prior point in time, and it would permit the testimony to lead to the infliction of criminal penalties for prior conduct of the witness.

Thus, for the very reasons that the Court in *Kastigar* held the use immunity statute on its face to be constitutional, this court must hold that granting the proposed immunity order in this case would violate the witness's Fifth Amendment rights.

*Does This Court Have Discretion as to Whether to Issue the Use Immunity Order?*

18 U.S.C. § 6003 provides that when requested by the United States Attorney upon approval of the Attorney General and another designated official, a United States District Court *shall* issue the use immunity order. The United States Attorney may request the order when in

his judgment the testimony of the witness "may be necessary to the public interest" and when the witness "has refused or is likely to refuse to testify" on the basis of the Fifth Amendment privilege. An ancillary question is therefore presented in these proceedings. May Congress constitutionally prohibit the use of judicial discretion? Section 6003 states in plain words that the court "shall issue" an order when the government requests it and the request is in accordance with specified procedures.

With reference to the function of the court in granting immunity requests by the government, the Senate report on § 6003 states:

"The court's role in granting the order is merely to find the facts on which the order is predicated. The statutory language is 'shall.' . . . Compare In Re Bart [113 U.S. App. D. C. 54], 304 F.2d 631 (D.C. Cir. 1962) . . . ." Senate Report, *supra,* at 145.

It is clear from the statute that the court may not review the administrative decision in seeking a grant of immunity. The determination to request an order is an administrative matter outside the judicial function. The judicial function would then normally be limited to a fact finding process, to determine whether the procedures specified in the statute have been complied with.

In this circuit the question of judicial discretion with respect to 18 U.S.C. § 2514 was presented in Bursey v. United States, 466 F.2d 1059 (9th Cir. 1972). Section 2514 does not contain explicit language comparable to the "shall issue" language of § 6003. The court held:

"The district court is not empowered to control the course of a grand jury investigation. In passing upon an immunity application, the court is confined to an examination of the application and the documents accompanying it for the purpose only of deciding whether or not the application meets the procedural and substantive requirements of the authorizing stat-

ute. (In re Russo (9th Cir. 1971) 448 F.2d 369; *cf*. Ullmann v. United States (1956) 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511.)" 466 F.2d at 1073.

*Ullmann* is the leading case on judicial discretion with respect to applications for immunity. It was referred to numerous times in the congressional hearings leading up to the enactment of the use immunity statute. *Ullmann* concerned an application for immunity under the Immunity Act of 1954, *supra,* which provided, with respect to offenses embraced by the statute, that

"(c) [w]henever in the judgment of a United States attorney the testimony of any witness . . . is necessary to the public interest, he, upon the approval of the Attorney General, shall make application to the court [for an immunity order], and upon order of the court such witness shall not be excused from testifying [on Fifth Amendment grounds] . . . ."

The immunity conferred was transactional in scope. The statute also provided that no witness was exempt from "prosecution for perjury or contempt committed while giving testimony or producing evidence under compulsion as provided in this section."

The question presented in *Ullmann* was whether the district court had discretion to review the United States Attorney's determination that the testimony of a grand jury witness is "necessary to the public interest." The court held that

"[a] fair reading of § (c) does not indicate that the district judge has any discretion to deny the order *on the ground that the public interest does not warrant it*. . . . Since the Court's duty under § (c) is only to ascertain whether the statutory requirements are complied with by the grand jury, the United States Attorney, and the Attorney General, we have no difficulty in concluding that the district court is confined within the scope of 'judicial power.' Interstate Commerce

Commission v. Brimson, 154 U.S. 447, 14 S.Ct. 1125, 38 L.Ed. 1047 [1894].” 350 U.S. at 432–434, 76 S.Ct. at 503. (Emphasis added.)

■ The issue of judicial discretion presented in this case is different from that in *Ullmann.* There is no question that, under *Ullmann,* the court cannot review the administrative judgment that the testimony of the witness “may be necessary to the public interest.” Indeed, the language of § 6003 that the court “shall issue” the immunity order upon the request of the United States Attorney simply codifies the holding of *Ullmann.* The court interprets that language to mean that it has no discretion to review the United States Attorney’s determination that a witness’s testimony may be necessary to the public interest.

Rather, the issue here is whether the court has discretion to decline to grant an immunity order when granting the order would violate the constitutional rights of the witness to whom the order is directed. The issue is one of constitutional dimension, not merely one of determining what is in the public interest. As such, it is vastly different from the issue decided by the Court in *Ullmann.* In that case, the Supreme Court found no reason for the district court to deny a grant of immunity, because the immunity conferred was complete.

■ Congress cannot compel the courts to issue orders which violate the constitutional privileges of this nation’s citizens. As the Ninth Circuit stated in MacDonald v. Musick, 425 F.2d 373, 375 (9th Cir.), cert. denied, 400 U.S. 852, 91 S.Ct. 54, 27 L.Ed.2d 90 (1970), where the trial court had asked the defendant to agree to a stipulation which violated his constitutional rights:

“The situation is made no better by the fact that here . . . it was the court that asked MacDonald whether he would stipulate. Rather, it makes it worse. It brings the court to the aid of the prosecutor in coercing the defendant into agreeing to

what amounts to a forfeiture of his civil rights. . . . ”

■ The situation is no different in the instant case. The court cannot engage in any action which deprives a party before it of his constitutional rights. It has long been recognized that it is a proper function of courts to act as a check on improper use of both executive and legislative investigatory powers. As the Supreme Court stated in Powell v. McCormack, 395 U.S. 486, 506, 89 S.Ct. 1944, 1956, 23 L.Ed.2d 491 (1969), quoting from Kilbourn v. Thompson, 103 U.S. 168, 199, 26 L.Ed. 377 (1881):

“ ‘Especially is it competent and proper for this court to consider whether its [the legislature’s] proceedings are in conformity with the Constitution and laws, because, living under a written constitution, no branch or department of the government is supreme; and it is the province and duty of the judicial department to determine in cases regularly brought before them, whether the powers of any branch of the government . . . have been exercised in conformity to the Constitution; and if they have not, to treat their acts as null and void.’ ”

And as the Court stated in Watkins v. United States, 354 U.S. 178, 187–188, 77 S.Ct. 1173, 1179, 1 L.Ed.2d 1273 (1957):

“It is unquestionably the duty of all citizens to cooperate with the Congress in its efforts to obtain the facts needed for intelligent legislative action. It is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation. This, of course, assumes that the constitutional rights of witnesses will be respected by the Congress as they are in a court of justice. The Bill of Rights is applicable to investigations as to all forms of governmental action. Witnesses cannot be compelled to give evidence against themselves. They

cannot be subjected to unreasonable search and seizure. Nor can the First Amendment freedoms . . . be abridged."

*Cf.* Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967). The Court's statements are as applicable to a grand jury as to a congressional committee.

While this court holds that it can, and indeed must, exercise discretion on constitutional principles to refuse to issue the immunity order, there are indications in the legislative history that Congress intended the use immunity statute to allow for judicial discretion where constitutional rights were involved. For example, Senator McClellan, a senior member of the Senate Judiciary Committee, appeared before the House Judiciary Committee to inform members of Senate action in previously passing the Organized Crime Control Act. With regard to the use immunity provision, Senator McClellan noted that "[t]he granting of immunity in court and legislative proceedings is subject to court review . . . . " House Hearings, *supra*, at 83. At House hearings in 1969 on the Federal Immunity of Witnesses Act, later enacted in almost identical form as Title II of the Organized Crime Control Act of 1970, Professor Robert G. Dixon, Jr., a consultant to the National Commission on Reform of Federal Criminal Laws, testified. The Commission had drafted and sent to Congress the initial formulation of the use immunity statute. While noting that the role of the federal court was limited under *Ullmann*, Professor Dixon characterized the use immunity bill as drafted as follows:

"[T]his is not an anticourt bill. The courts came into the matter only in 1954 as a procedural element and have operated since only in ministerial fashion and only under a few statutes. We continue that [in the use immunity bill]. None of this precludes a jurisdictional check [to safeguard the witness against the agency exceeding its jurisdiction], or even beyond that *a court check to see if there is an overreaching in the process of immunizing somebody just as a matter of due process.*" Hearings on H.R. 11157 and H.R. 12041 Before Subcomm. No. 3 of the House Comm. on the Judiciary, 91st Cong., 1st Sess., ser. 14, at 69 (1969). (Emphasis added.)

Leaving aside constitutional principles, the court finds that as a matter of statutory construction, § 6003 was not intended to preclude the exercise of judicial discretion in the presence of an "overreaching" that entails the denial of constitutional rights if immunity is granted.

█ Upon either a constitutional or a statutory basis, therefore, the court concludes that it is not relegated to a ministerial role, but that it can, and hereby does, exercise discretion to decline to issue the immunity order in the face of a violation of the witness's constitutional rights.

### Is the Issue Properly Before the Court at This Stage?

█ It may be argued that the district court must grant the immunity order, and then exercise its judicial function in the context of a prosecution against the witness for false statements. *Kastigar* held that there is no constitutional right to silence, but that the Fifth Amendment protects only against being " 'forced to give testimony leading to the infliction of "penalties affixed to . . . criminal acts." ' " (Footnote omitted.) 406 U.S. at 453, 92 S.Ct. at 1661.

"The privilege assures that a citizen is not compelled to incriminate himself by his own testimony. It usually operates to allow a citizen to remain silent when asked a question requiring an incriminatory answer. This statute, which operates after a witness has given incriminatory testimony, affords the same protection by assuring that the compelled testimony

can in no way lead to the infliction of criminal penalties. . . ." 406 U.S. at 461, 92 S.Ct. at 1665.

However, Miss Baldinger should not have to wait until she is prosecuted to assert her Fifth Amendment privilege. She has standing to do so now. If in fact she has made false statements to the FBI agents, then under the exception to immunity in § 6002 the government can use her testimony before the grand jury to prove that she made false statements in the past. Under the exception from immunity, the government is specifically permitted to use her compelled testimony in this manner, and a court would be powerless under the statute to prevent it in the context of a prosecution for false statements. The exception provides no immunity against the use of compelled testimony in a prosecution for having made prior false statements.

It may be contended that the court must still grant the immunity order, because it does not know whether Miss Baldinger's statements to the FBI agents were in fact false so as to subject her to prosecution under § 1001. This contention begs the question. If there is any possibility that the statements were false, then, as detailed above, the exception to the statute will specifically permit the government to use the compelled testimony to prove the falsity of the statements. Miss Baldinger has represented to the court that she does not remember what she said to the FBI agents. Even if she believed her statements to the agents to be false, Miss Baldinger could not admit this fact to the court without incriminating herself of having made false statements. To require her to state any belief that the statements to the agents were false would force her to incriminate herself in order to support her contention that the granting of the immunity order would violate her Fifth Amendment rights. It would force her to give up her Fifth Amendment privilege now in order to assert her Fifth Amendment privilege with respect to her testimony before the grand jury.

It may also be argued that the court must grant the immunity order and then exercise its judicial function in the context of a contempt proceeding. Such an argument, however, must fail on at least two grounds. First, if the court may exonerate the witness from failing to comply with an unconstitutional order, it certainly can decline to issue the order in the first place.

Second, the witness may choose to comply with the unconstitutional order for various reasons and thereby become liable for prosecution, although testifying truthfully before the grand jury. Under the exception from immunity, the court's granting of the proposed order would thereby lead directly to the witness's prosecution for false statements and to the possibility of infliction of criminal penalties. In that instance, the court will have become the instrument through which constitutional rights have been taken away. It is the paramount function of the court to stand as the sentinel against the violation of constitutional rights by the other branches of our government. How ironic it would be if the court in this instance had to say that it is powerless to protect those rights.

Furthermore, Miss Baldinger is the one against whom the proposed use immunity order and § 1001 directly operate. Just as in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973), where the Supreme Court held that the abortion physicians need not "be required to await and undergo a criminal prosecution as the sole means of seeking relief," so Miss Baldinger need not await a contempt proceeding before she may assert her rights under the Fifth Amendment.

*Summary*

The court holds that under the facts of this case, the proposed immunity order does not provide immunity coextensive

with the claim of the Fifth Amendment privilege against self-incrimination. Miss Baldinger's compelled testimony could be used against her in a false statement prosecution, under the exception to immunity contained in the proposed order. Under the exception to the statute and the proposed order, *no* immunity is conferred against the use of compelled testimony against the witness to prove prior false statements.

When faced with a possible violation of a constitutional guarantee, the court's function under § 6003 is not purely ministerial. The court in the exercise of its judicial discretion will not issue an order which would compel Miss Baldinger to be a witness against herself. An interpretation of § 6003 which would forbid the exercise of judicial discretion when issues of constitutional magnitude are presented would violate Article III of the Constitution. This court will not become an unwilling participant to a violation of constitutional freedoms.

The government is not without recourse. It may, of course, request Congress to amend the use immunity statute; or it may do what it did in In re Bottari, 453 F.2d 370 (1st Cir. 1972), and in Bursey v. United States, *supra*— request an order granting transactional immunity under 18 U.S.C. § 2514. The government in fact at first applied for a grant of transactional immunity for Miss Baldinger but withdrew that request. In *Bottari*, the court stated that since the witness had been granted transactional immunity, he "never will be a defendant" in any matter relating to his testimony. 453 F.2d at 371. If transactional immunity were conferred upon Miss Baldinger, she would be in no danger of incriminating herself in violation of the Fifth Amendment, since she would be immunized from prosecution for all past offenses relating to her testimony.

For the foregoing reasons, the government's application for a grant of immunity under the use immunity statute is denied.

APPENDIX

## "ORDER GRANTING IMMUNITY"

"Now on this _____ day of _____, 1972, this matter comes on upon the Application of WILLIAM D. KELLER, United States Attorney for the Central District of California, to grant immunity pursuant to Title 18, United States Code, Section 6003, to SARA BALDINGER and to order SARA BALDINGER to testify and produce evidence before a grand jury convened in the Central District of California, sitting at Los Angeles, California, the witness, SARA BALDINGER being present in person and with her attorney.

"After hearing evidence and being advised in the premises the Court finds that a duly constituted grand jury for the Central District of California is sitting at Los Angeles, California; that the grand jury is inquiring into matters involving violations of Federal statutes; that the said SARA BALDINGER appeared before the grand jury and was asked questions by the grand jury pertaining to this matter; that SARA BALDINGER refused to answer these questions on the grounds that the answers might tend to incriminate her; that SARA BALDINGER is likely to continue to refuse to testify and provide information to the grand jury on the basis of her privilege against self-incrimination; that the testimony of the said SARA BALDINGER is, in the judgment of the United States Attorney for the Central District of California, necessary to the public interest; that the Attorney General of the United States has approved the Application for immunity.

"The Court further finds that the Application for grant of immunity in accordance with Title 18, United States Code, Section 6003, should be allowed; and that the said SARA BALDINGER should answer questions asked by the grand jury.

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Application heretofore made by WILLIAM D. KELLER, United States At-

torney for the Central District of California, to grant immunity to SARA BALDINGER in accordance with Title 18, United States Code, Section 6003, be and the same hereby is allowed. It is further ORDERED that SARA BALDINGER answer all questions asked by the grand jury and give testimony and provide information to the grand jury.

"IT IS FURTHER ORDERED that no testimony or other information compelled under the order or any information directly or indirectly derived from such testimony or other information, shall be used against SARA BALDINGER in any criminal case, except that the said SARA BALDINGER shall not be exempted by this order from prosecution for perjury, giving a false statement, or otherwise failing to comply with this order.

"IT IS SO ORDERED.

"Dated this ———— day of ——————, 1972.

————————

United States District Judge"